**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 07-cr-160-JR |
| | ) | |
| DRIBJOT S. DUA, | ) | |
| | ) | |
| Defendant. | ) | |

<u>Government's Memorandum In Aid Of Sentencing</u>

The United States of America, by and through the United States Attorney for the District of Columbia, submits the following memorandum in aid of sentencing.

<u>Background</u>

On July 6, 2007, defendant Dribjot S. Dua, pursuant to a plea agreement, waived indictment and pled guilty to an information charging him with mail fraud against America's Health Insurance Plans, Inc. (AHIP), occurring from on or about April 11, 2004, to on or about March 19, 2007, in violation of 18 U.S.C. §§ 2 and 1341.  The information also contained a forfeiture count requiring the defendant to forfeit:  a money judgment in the amount of $940,664.68; $9221.94 in funds from a Bank of America bank account; $26,030 in U.S. currency; $16,000 in traveler's checks; a computer program valued at $269.82; a computer valued at $3589; and three computer hard-drives valued at a total of $2775.  At the time of the guilty plea, the Court entered a consent order of forfeiture requiring the forfeiture of these assets to the government.

Sentencing is now set for March 20, 2008, at 11:00 a.m.

Facts

AHIP

AHIP is a non-profit trade association of health insurance companies.  Its office is located at 601 Pennsylvania Avenue, N.W.  The association represents the interests of nearly 1300 insurance companies that collectively provide health insurance to more than 200 million Americans.  During the period of the defendant's fraud, 2004-07, as well as today, the association employed approximately 175 people, about seven to nine of whom are responsible for managing the office's information technology (IT) needs.

During the period of the fraud, AHIP held an insurance policy with the Hartford Casualty Insurance Company, to protect it against losses caused by employee dishonesty.  The maximum amount payable on the policy, per employee per incident, was $50,000.[1]  AHIP recently increased the amount of its coverage.

The Defendant's Application for Employment With AHIP

AHIP's relationship with the defendant began on March 15, 2004, when he forwarded a resumé to the association, in response to an ad AHIP had placed in the Washington Post seeking an IT

---

[1]On September 11, 2007, the Hartford company paid AHIP $50,000, pursuant to this policy, on a claim predicated on the defendant's fraud.  This payment implicates the amount of restitution due to AHIP, as discussed below.

manager.  The defendant's resumé listed Equest Technologies, in Gaithersburg, as his place of employment for "2003-2004."  The resumé listed a Rockville company, Medifacts International, as his place of employment from 1998 to 2003.

In fact, defendant Dua only worked at Equest Technologies from May 27, 2003, to September 24, 2003, when he was terminated due to a lack of available work.  At the time of his application to AHIP, he was actually working as an IT manager for XFI Corporation, a software development company in Bethesda, having started there on October 13, 2003.

The defendant had more than one reason to conceal his XFI employment from AHIP.  One was simply that he had received an unfavorable performance review from that company on November 19, 2003, a review in which he was threatened with the loss of his job.  But more significantly, while at XFI the defendant caused that company to order and pay for approximately $2400 worth of computer equipment from Network Circle, Inc., his alter-ego corporation that would be the vehicle for the massive fraud he committed against AHIP.

With no knowledge of his prior employment with XFI, nor any knowledge of his connection to Network Circle, AHIP hired the defendant as its IT manager.  His first day was April 19, 2004. His starting annual salary was $82,000.

Network Circle, Inc.

On March 5, 2003, the defendant established Network Circle, Inc., as a Maryland corporation, with its principal office being the defendant's residence in Gaithersburg. The company's articles of incorporation list the defendant as the sole director.

On March 11, 2003, the defendant opened a bank account in the name of Network Circle, Inc., at a Bank of America branch in Rockville, with an initial deposit of $1000. The defendant identified himself as the company's president, and listed himself as the only person authorized to access the account. The defendant provided the bank with a post office box in Gaithersburg as an address for Network Circle. He had opened the post office box the day before.

The defendant appears, initially, to have done his best to legitimize Network Circle. For instance, not counting AHIP, of course, or XFI, bank records show that Network Circle received payments from three customers, during the period December 2003 to September 2004, totaling approximately $6100.

He also maintained an authentic-looking website for his company, at www.networkcircle.com. Significantly, however, nowhere on the site could one find the name of a person employed by the company. Under the "contacts" tab, for example, one would find only a series of generic e-mail addressees--e.g., "techsupport@networkcircle.com"--and the same toll-free number

listed multiple times.  Under a tab labeled "partners," the site
had a number of logos for established computer and
telecommunications companies, including Cisco Systems, AT&T
Wireless, and T-Mobile.

Had the case proceeded to trial, the government would have
queried all of these companies to determine whether they in fact
had a partnership with the defendant's company.  Cisco Systems,
which the site represented to be a "registered partner" with
Network Circle, was contacted, however.  That company does in
fact have a partnership program with authorized re-sellers and
distributors; it confirmed unequivocally that it had no such
relationship with Network Circle.[2]

The Beginning of the Fraud

As an IT manager at AHIP, the defendant had the authority to
identify and order products from computer companies as needed.
No one at AHIP needed to approve the vendor he selected.
However, he did not have authority to issue an AHIP check.  That
required the approval of AHIP's accounting department.

On May 17, 2004, about a month after joining AHIP, the
defendant presented the first Network Circle invoice to AHIP's

_____

[2]It is easy to see why the defendant listed Cisco Systems as
a partner on the website.  Founded in 1984, and based in San
Jose, California, Cisco Systems, Inc., currently employs more
than 63,000 people.  The company manufactures and services a
variety of computer and internet-related products, and had nearly
$35 billion in revenue in its most recent fiscal year.

accounting department.  The invoice consisted of a bill for 15
copies of "Office XP Professional (OEM Version)," a Microsoft
software product, for $310 each.  With a shipping charge of $22,
the invoice indicated a total amount due of $4672.  Nothing on
the face of the invoice revealed the defendant's connection to
Network Circle.  The invoice only had the post office box address
in Gaithersburg, the toll-free number, and the website address.

AHIP's accounting department needed to know one primary
piece of information before it would authorize a check to pay an
invoice:  Was payment on the invoice approved by a manager in the
relevant department?  Thus, an accounting official duly inquired
of the defendant, the office's IT manager, whether it was okay
for AHIP to pay this $4672 invoice for this software.  And he
duly told them it was.  Significantly, there was no requirement
that the invoiced products be received by AHIP prior to payment
to the vendor.

Three days later, on May 20, 2004, the defendant submitted
to accounting another Network Circle invoice in the amount of
$661, ostensibly for a Microsoft Windows 2003 Server.  The same
process took place, and a day later AHIP's accounting department
authorized payment.

Thus, on May 27, 2004, the first AHIP check was issued to
Network Circle, in the amount of $5333.  AHIP accounting
personnel would later recall that the defendant would frequently

offer to take care of getting AHIP checks to Network Circle, and would ask that they be given to him.  Other times, accounting would mail the checks to the Network Circle post office box in Gaithersburg.  Most likely, the defendant took personal possession of this first check, in his AHIP office, the very day it was issued.  Bank records show it was deposited in the Network Circle account at Bank of America either that same day, May 27, 2004, or the following day.  The defendant's handwriting is readily recognizable on the deposit slip.

These first two invoices both stated on their face that shipment of the products would be by Fed Ex to AHIP's office at 601 Pennsylvania Avenue, N.W.  As mentioned above, AHIP was charged a shipping fee on both invoices.  Neither AHIP nor Fed Ex has a record that the 15 software programs or the server were ever shipped to or received by AHIP.  In fact, an inquiry with Fed Ex would later show that, while Network Circle did have a Fed Ex account, no shipment to AHIP's offices was ever charged to it.  AHIP's mail department never saw a single box marked as being sent from Network Circle.

The Fraud Continues

Those first two Network Circle invoices opened the floodgates.  For 2004, including the two invoices and the $5333 discussed above, AHIP paid Network Circle over $106,000, for computer equipment and software listed in 23 separate invoices.

With one exception, each of the invoices included a shipping charge incurred by AHIP, and each specified that shipment would be by Fed Ex to AHIP's offices.  In one instance, a $3840 invoice dated July 19, 2004, for six copies of Microsoft software, no shipment method or shipping charge was specified.  There is no record of any of the items listed on the Network Circle invoices ever being delivered to AHIP.

During this same period, bank records show how the defendant spent AHIP's money.  These are some of the highlights.  On June 16, 2004, the defendant wrote two checks on the Network Circle account to Empire Home Improvement for a total of $1858.  On July 9, 2004, there is a $1407.62 charge to the Network Circle account for expenses at the Niagara Falls Hilton Hotel.  On July 26, 2004, there is a $1622 charge to the account for payment to Omni Floors and Remodeling, and on August 3, 2004, the defendant wrote a check to Omni Floors for $1621.50.  In August 2004, $4086.49 from the account was paid to Circuit City, over three occasions.  On August 24, 2004, he wrote another check to Empire Home Improvement, for $5000.  On August 31, 2004, the account paid $1554 to the MCI Center.  In September 2004, there are payments from the account to BMW Financial Services ($1500), Countrywide Home Loans ($500), HSBC Mortgage Corporation ($5700), and Bed Bath and Beyond ($712.88).  In October 2004:  Nissan Motor Acceptance Corporation ($600), BMW Financial Services ($1000),

Countrywide ($500), HSBC Home Mortgage (2000), VOB Auto Sales ($2295.67).  In November 2004:  Nissan Motor Acceptance Corporation ($600), Countrywide ($500), HSBC Mortgage ($2000). And in December 2004:  Nissan Motor Acceptance Corporation ($600), Countrywide ($500), Ikea ($902.34), and Mervis Diamond Importer ($2415).  He also paid $2744 from the account to the Franklin Montessori School, for his child's nursery school tuition, for the months of September through December 2004.

Significantly, more than 94 percent of the value of deposits into the Network Circle account, from April 19, 2004, when the defendant began working for AHIP, until the end of that year, are attributable to checks from AHIP.

The fraud continued unabated in 2005.  In that year, AHIP paid Network Circle over $280,000, for 42 invoices.  Each invoice included an ostensible shipping charge to be incurred by AHIP. And each invoice indicated, falsely, that shipment would be by Fed Ex to AHIP's office.

Nearly 70 percent of the value of deposits into the Network Circle BOA account in 2005 is attributable to AHIP.  Significant debits from the account that year include:  $35,000 to Summit Title Company; $25,000 to cash; $11,000 to Omni Floors and Remodeling; $1500 to BMW Financial services; $7500 to Nissan Motor Acceptance Corporation; $2401.90 to HSBC Mortgage Corporation; $43,500 to Countrywide Home Loans; $1000 to CDS

9

Moving and Storage; $1117.20 to Mervis Diamond Importer; $2754.99 to R&R Pool and Patio; $2026.57 to Bed, Bath and Beyond; $2500 to Room Store; $851 to Next Day Blinds; 1529.85 to Marlo Furniture; $1355.11 to Ikea; $2001.60 to Sunset Hills Foliage; $2985.72 to United Airlines; $1121.93 to Marriot Hotels; and $11,181 to the Franklin Montessori School.

In 2005, the defendant also ordered two copies of Adobe Acrobat software, a Hewlett-Packard server, a Laserjet Printer, and other computer hardware, from the company CDW Direct.  The defendant directed AHIP's accountants to pay CDW for these items (total cost:  $5361.54).  Without authorization from AHIP, he also instructed CDW to deliver these items to his residence. AHIP never had the use of these items.[3]

2006 was the defendant's most prolific year for defrauding AHIP.  AHIP paid Network Circle nearly $430,000, for 32 invoices. Once again each invoice called for shipment via Fed Ex, and, in most instances, included a specific shipping charge incurred by AHIP.  Over 90 percent of the value of the deposits into the Network Circle BOA account was attributable to payments from

---

[3]One copy of the Adobe software and the H-P server, were recovered when the defendant's Boyd's, Maryland residence was searched on April 27, 2007.  Also recovered were three H-P hard drive "plug-ins" that the defendant had ordered from CDW, at AHIP expense ($2775), on September 8, 2005.  The CDW invoice indicates the plug-ins were to be delivered to the defendant's attention at AHIP's office.  AHIP never authorized the defendant to remove these items from the office.

AHIP.  In 2006, among other expenses, the defendant used funds from the account to pay Countrywide Home Loans ($59,455), Lexus of Rockville ($31,140.66); Porsche of Arlington ($499); King Volkswagen ($14,589.80); American Airlines ($3821.40); Alfaro Landscaping Specialists ($800); Howell Landscaping ($1050); Ticketmaster ($1010.10); Red Door Spa ($860); Dick's Clothing and Sporting Goods ($607.01); and Elite Entertainment ($500).  He also made a year's worth of tuition payments to the Franklin Montessori School.

2007 was the final calendar year of the fraud.  In that year, AHIP paid Network Circle nearly $58,000, for four invoices, each of which again called for shipment to AHIP's office via Fed Ex, and each of which included a shipping fee charged to AHIP. AHIP's checks constituted over 97 percent of the monies the defendant deposited into the Network Circle account in 2007.

It all fell apart for the defendant in March 2007.

Discovery of the Fraud

On March 5, 2007, AHIP's chief financial officer made a list of the ten vendors AHIP purchased from the most in calendar year 2006.  The purpose of the list was to identify companies AHIP could solicit for contributions to its affiliated charitable entity, the AHIP foundation.  Near the top of the list was Network Circle.  The CFO showed the list to the head of AHIP's IT department, the defendant's direct supervisor.

The IT chief did not recognize the name Network Circle, and at first thought it was a company that sold non-IT items to AHIP. AHIP's accounting department, however, advised him that Network Circle was one of AHIP's IT vendors.  When he still did not recognize the vendor name, he began to review the association's accounting files for Network Circle, which, as expected, showed the defendant's authorization for each purchase from Network Circle.

The supervisor also discovered that the defendant was authorizing the purchase of hundreds and hundreds of software licenses from Network Circle, three or four times above the number needed by AHIP.[4]

As the supervisor was puzzling over this, he also asked the defendant for a point of contact at Network Circle, since none was indicated on the invoices, so he could send a solicitation for a contribution to the foundation.  The supervisor at this time did not know the defendant owned Network Circle; he merely thought the defendant must have a name of someone there, since he ordered so many products from them.

_____

[4]A software license is essentially legal permission from a software developer for a customer to make use of the software. Typically, the software developer will authorize the companies that sell its software to also sell the licenses to use it.  AHIP had about 175 employees in March 2007.  The defendant's supervisor saw that the defendant was ordering up to 500 licenses from Network Circle for certain software.

The defendant said he would get him one, and two days later gave the supervisor the first name "Dave," and the e-mail address, dave@networkcircle.com. The supervisor had a few e-mail exchanges with Dave, who promised Network Circle would send a check. No check was ever received.

Unbeknownst to the supervisor, "Dave" was a friend of the defendant named Davinder Singh. Mr. Singh knew the defendant from the defendant's frequent visits to Mr. Singh's Indian restaurant in Gaithersburg. Mr. Singh has no background in computers. After the supervisor asked the defendant for a point of contact at Network Circle, the defendant told Mr. Singh that he was going to give his name and cell phone number to someone at AHIP, who might call him and ask him for a donation to the AHIP foundation. The defendant instructed Mr. Singh to simply say he would be sending a check.

As it happened, the supervisor never called Mr. Singh on the phone. He only sent e-mails, to which "Dave" responded by e-mail. Dave's e-mail responses identified him as Network Circle's "senior account manager," and included a cell phone number (but no street address) belonging to Mr. Singh, in order to look authentic. Mr. Singh never actually saw the e-mails from the AHIP supervisor. The defendant typed the responses himself, including one in which he wrote, on March 16, 2007, that he was

forwarding the solicitation to Network Circle's "accounting department," whom he said would be sending a check "soon."[5]

At the same time as these e-mails were being exchanged, the supervisor asked a friend to do a Dunn & Bradstreet search of the company Network Circle. The friend did so and then advised the defendant's supervisor, on March 15, 2007, that Network Circle was owned by someone named D.J. Dua. The supervisor immediately recognized the defendant's nickname. The supervisor promptly advised AHIP's Chief Financial Officer, who in turn advised AHIP's attorneys.

On March 19, 2007, the CFO and the defendant's supervisor sat down with the defendant in the supervisor's office. They asked him why he was buying so many software licenses from Network Circle. The defendant stated he was familiar with Network Circle, but offered no explanation why he was authorizing the purchase of so many software licenses. He was told he was being placed on administrative leave with pay. The supervisor then walked with the defendant to the defendant's office.

In the defendant's office, the supervisor asked him if the licenses, which are frequently evidenced by certificates, were

---

[5]Ironically, the defendant's supervisor had met Mr. Singh in the winter of 2005-06, when the defendant and his supervisor, along with their families, had dinner together at Mr. Singh's restaurant. The gathering was the defendant's suggestion, and he had chosen the restaurant. During the dinner, the defendant introduced his supervisor to Mr. Singh.

located in his office.  The defendant said they were, and pointed towards a shelf.  The supervisor looked on the shelf, but found only CDs and other items.  The defendant then said the licenses were listed on a directory on his AHIP laptop, and showed the directory to the supervisor.  The supervisor looked at the laptop screen, on which there was an e-mail directory.  No licenses were apparent.  The defendant then said he had them at home, and would e-mail them to the supervisor.

During this exchange, the defendant also said he wanted to erase some "personal stuff" from his AHIP blackberry and laptop. He began to do so, until the supervisor demanded he stop.  The supervisor then escorted him from the building.

Later that evening, the defendant sent the supervisor an e-mail advising he was resigning, and asked that his last paycheck and 401(k) funds be sent to him.

### The Statutory Maximum Sentences, the Plea Agreement, and the Sentencing Guidelines

The offense to which the defendant pled guilty, mail fraud, carries a maximum prison sentence of 20 years, and a maximum supervised release period of three years.  The maximum fine is $1,881,329.36, which constitutes two times the pecuniary loss suffered by AHIP.  The defendant must also pay, and has already paid, a special assessment of $100.

The Court is also required to order restitution.  The restitution amount due to AHIP is $881,034.55, which represents

15

the total loss suffered by AHIP ($940,664.68) minus the amount of the defendant's unclaimed paychecks and leave amounts ($9629.83), minus the $50,000 paid to AHIP by its insurance company.  These monies have been paid directly to AHIP.  While the defendant has made additional payments since pleading guilty, and while certain assets were seized from his residence, these payments and assets are not yet considered formally forfeited to the government, and therefore cannot be credited--at this time--toward the amount owed by the defendant in restitution, as allowed for by the plea agreement.

In addition, pursuant to 18 U.S.C. § 3664(j)(1), the restitution order should also require the defendant, after satisfying his restitution obligations to AHIP, to pay Hartford, AHIP's insurance company, $50,000.[6]

The government concurs with the guideline range calculations set forth in the pre-sentence report:  27 to 33 months in prison; two to three years of supervised release; and a fine of $6000 to $60,000.

Under the terms of the plea agreement, the parties are free to allocute for any sentence, although the agreement specifies that both parties agree that a sentence within the applicable

---

[6]Any check from the defendant to the insurance company should be made payable to The Hartford, and sent to the attention of Andrew Reed, at Post Office Box 2905, Phoenix, Arizona  85062-2905.

16

guideline ranges would constitute a reasonable sentence.  The agreement requires the defendant to meet certain financial obligations prior to sentencing, including the execution of any documents necessary to forfeit (1) his interest in his earned but unpaid salary and leave at AHIP; and (2) his interest in AHIP's 401(k) Profit Sharing Plan and Trust.  The defendant has done so with respect to those two matters.  However, the defendant was also required by the defendant to make a lump sum payment of $160,000 to the government, within one week of sentencing.  To date he has paid only $50,000 of that amount.

<u>The Appropriate Sentence</u>

In fashioning a sentence, the Court is required to consider the following factors:  (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (4) the need for the sentence to afford adequate deterrence; (5) the need for the sentence to protect the public from the defendant; (6) the need for the sentence to provide the defendant with educational or vocational training, medical care or other correctional treatment; (7) the kinds of sentences available; (8) the Sentencing Guidelines, including policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities among defendants with similar

17

records who have been found guilty of similar conduct; and (10) the need to provide restitutions to victims.  18 U.S.C. § 3553(a).

The nature and circumstances of this offense, the government submits, are quite serious.  The defendant did not harm a large, faceless institution.  Rather, he callously victimized a modest-sized, non-profit association, and betrayed its small IT department, a department small enough (7 to 9 persons) for everyone to know each other by name.  The defendant's conduct cost AHIP nearly $1 million.  It spanned almost the entire 23-month period of his employment, beginning less than a month after his first day on the job.

Details of the defendant's character and history, the second factor the court must consider, are set out in the presentence report.  Significantly, the defendant appears to have had an unremarkable middle-class upbringing, with no hardships or difficulties that might explain his criminal conduct.

The government submits that the third, fourth and fifth factors compel a significant sentence that includes a significant period of incarceration.  The offense was serious, and a length of incarceration is necessary to promote respect for the law, deter the defendant, and protect the public.

As for the sixth factor, the defendant, who has two masters degrees and has been trained in numerous aspects of the IT field,

18

is not in need of educational, vocational or other correctional
training.  He does suffer from high blood pressure and diabetes,
but this is not debilitating, as the pre-sentence report
indicates he plays racquetball three times a week.  The
government submits that the Bureau of Prisons can make
accommodations for his ailments even in an incarcerated setting.

The seventh factor requires the Court to consider the kinds
of sentences available.  While probation is not precluded by
statute or by the plea agreement, the government submits that it
is not appropriate due to the seriousness of the offense.

The eighth factor requires the Court to consider the
Sentencing Guidelines, and the ninth factor requires the Court to
consider the need to avoid sentencing disparities.  The
government submits that a sentence generally consistent with the
applicable ranges under the Sentencing Guidelines for this case
would be just.  Moreover, a guideline-compliant sentence would
also avoid sentencing disparities.  See 28 U.S.C. § 991(b)(1)(B)
(providing that a purpose of the Sentencing Commission is to
establish sentencing policies and practices that avoid
unwarranted sentencing disparities).

The tenth factor requires the Court to consider the need for
restitution.  This defendant has shown a remarkable penchant for
finding well-paying IT jobs.  He is employed in one now,
notwithstanding his guilty plea last summer.  The Court can

facilitate restitution by requiring the defendant to make periodic payments to AHIP from his prison earnings during incarceration, and then as a condition of his supervised release. The government recognizes, of course, that the defendant may be incarcerated by immigration authorities following completion of his prison term. However, the plea agreement allows him to contest deportation, and he may be able to secure release pending resolution of deportation proceedings.

The government submits that a prison sentence at the top of the guideline term of imprisonment, i.e., 33 months, would generally be appropriate based on the factors in 18 U.S.C. § 3553(a). However, the government also recognizes that the defendant faces likely deportation after completing any prison term, and thus, consistent with the plea agreement and United States v. Smith, 307 U.S. App. D.C. 199, 27 F.3d 649 (1994), recommends a prison term of 30 months.

This should be followed by a supervised release period of three years, the guideline and statutory maximum, to facilitate enforcement of restitution payments. The government recognizes that the defendant may be deported during the period of supervised release. And while deportation would make enforcement difficult, he should nonetheless be required to make restitution payments throughout the period of supervision.

The defendant should not be required to pay any fine, given that it would impair his ability to pay restitution.  <u>See</u> 18 U.S.C. § 3572(b).

                    Respectfully submitted,

                    JEFFREY A. TAYLOR
                    UNITED STATES ATTORNEY


                         /s/
          by:  _____
                    Michael C. Liebman
                    Assistant United States Attorney
                    D.C. Bar No. 479562
                    555 Fourth Street, N.W., room 9443
                    Washington, D.C.  20530
                    514-7397
                    michael.liebman@usdoj.gov